## HAMPTON CO. v. JOYCE.
### No. 2615.

Court of Civil Appeals of Texas. Beaumont.
March 15, 1935.

Rehearing Denied April 20, 1935.

Pipkin & Pipkin, of Beaumont, for appellant.

Howth, Adams & Hart, of Beaumont, and White & Baker, of Port Arthur, for appellee.

WALKER, Chief Justice.

On trial of this case to a jury in lower court, appellee, S. C. Joyce, was awarded judgment for $7,500 as compensation for injuries suffered by him in a collision between a motorcycle he was riding and the ambulance of appellant, the Hampton Company, which occurred on or about August 8, 1932, at the intersection of Houston avenue and Seventh street in the city of Port Arthur. The Hampton Company has duly prosecuted its appeal from that judgment.

We overrule appellee's motion that this court is without jurisdiction to entertain the appeal. The facts of the motion are as fol-

lows: Judgment was entered on July 29, 1933. The original motion for new trial was filed on August 7th following. On August 26th following, appellant filed its amended motion for new trial. Permission from the court was not obtained or given for the filing of the amended motion at the time of its filing. On August 26th, which was on Saturday, appellant's counsel merely handed the motion to the clerk of the district court, who promptly filed it. In accordance with his usual custom and manner of conducting business on Saturday afternoons, the trial judge was not in court at that time. On September 23d following, the amended motion was called for hearing, and on that day formal order for the filing of the amended motion was granted by the court and duly entered on the docket. Over the objections of appellant the hearing was postponed for two days, at which time it was duly heard and overruled. On a hearing on the amended motion appellee urged the point urged here, that the trial court had lost jurisdiction of the amended motion because formal permission was not granted for its filing, and denying this contention the trial court said: "Well, I may be wrong, gentlemen, but that is too narrow a technicality for me to pay any attention to; for a man to lose his right of appeal on a little narrow technicality like that, because he didn't get the leave of the Court. We all know that the Court would have given him leave. So I overrule that motion of plaintiff." The motion made in the trial court was renewed by appellee in this court in due time, and its general effect is thus summarized by appellant: "The basis of appellee's contention is that this appeal should be dismissed because appellant did not obtain leave to file its amended motion for new trial until after the actual filing thereof, even though it was filed within the time required by law."

There is no merit in appellee's motion. In Morrissey v. Jones (Tex. Civ. App.) 24 S.W. (2d) 1101, 1102, the court said: "Control over amendments is lodged in the trial court, and action therein will not be interfered with, unless palpable abuse of discretion is shown by the complaining party." In Finks v. Fitzpatrick (Tex. Civ. App.) 30 S.W.(2d) 419, 422, the court said: "We think the effect of the court's act in overruling the motion was to determine Fitzpatrick was entitled to file it. Thomas v. Young, 5 Tex. 253; Haynes v. Rice, 33 Tex. 167; Connell v. Chandler, 11 Tex. 249; Hopkins v. Seay (Tex. Civ. App.) 27 S. W. 899; Morrissey v. Jones (Tex. Civ. App.) 24 S.W.(2d) 1101." Under subdivision 29 of article 2092, R. S. 1925, on the facts deduced on the hearing, appellant had an absolute right to file its amended motion; we say "on the facts deduced on the hearing" for the reason that no element of estoppel was shown and no element of surprise to appellee, but the motion was filed in accordance with the usual custom of filing amended motions. The trial judge testified that he would have permitted the filing had the request been made. On these facts it is a correct construction of the statute to say that the failure to obtain the permission to file the amended motion was a mere irregularity, cured by the subsequent order of the court granting the permission. Hopkins v. Seay (Tex. Civ. App.) 27 S. W. 899; Smalley v. Paine, 102 Tex. 304, 116 S. W. 38; 49 C. J. 471.

■ Section 8 of article 827a of the Penal Code of 1925, as added by Acts 1929 (2d Called Sess.) c. 42, as amended by Acts 1931, c. 282, § 9 (Vernon's Ann. P. C. art. 827a, § 8), provides that it shall be unlawful to drive a motor vehicle within the corporate limits of a city or town at a greater rate of speed than twenty miles per hour. The jury found that, at the time of the collision, appellee was driving his motorcycle in the corporate limits of the city of Port Arthur at a greater rate of speed than that allowed by the Penal Code. It was also found that the rate of speed was "a contributing proximate cause" of appellee's injuries. Appellant's proposition is that, on the verdict of the jury, appellee was guilty of contributory negligence. The answer to this contention is that article 791 of the Penal Code 1925 provides that the speed limit of twenty miles per hour shall not apply to motor vehicles operated by police patrols and, on the undisputed evidence, appellee was a policeman of the city of Port Arthur, and, at the time he was injured, on police patrol. In this connection we overrule appellant's contention that the act of the Forty-First Legislature, passed in 1929, of which article 827a is a part, repealed by implication article 791, allowing the exemption to police patrols. There was no express repeal of article 791 by the act of 1929, and a careful study of that act has convinced us that article 791 was not repealed by implication. "Repeals by implication are not favored." 25 R. C. L. 918.

■ Appellant has assigned misconduct by the jury. This assignment must be sustained. During the trial, before the jury retired to consider its verdict, no reference whatever was made to "insurance." The following testimony was offered on the hearing

on motion for new trial, questions and answers reduced to narrative:

The foreman, Farha, testified: "I know from my own knowledge that there was a discussion of insurance while the jury was out. I really don't recall who was taking the leading part in the discussion, wouldn't be positive; but I think it was some of the jurymen there brought it up; I can't say exactly who it was, but it was discussed. After I told them that they shouldn't consider that, now, whether it stopped immediately or not, I am not in a position to say, but I think I put a stop to it, because I told them that shouldn't be considered in the case. I don't know whether anybody said in my presence that they knew that the defendant, the Hampton Company, had insurance in this case; it seemed like they was under the impression they had insurance. I told them I didn't know whether they had or not; that I thought ambulances, the premium on them was prohibitive, because I wrote insurance and wrote some for Roberts, but Roberts didn't carry any ambulance insurance; nothing but fire and theft, with me."

The juror Lacy testified:

"The discussion of the matter as to whether or not Mr. Hampton or The Hampton Company were covered by any sort of insurance in this action, covering this ambulance in the case in question was practically the first discussion. We all went in there and the question was raised that it would not cost Mr. Hampton anything to give Mr. Joyce a pension or whatever you call it, because he was highly insured and it wouldn't cost him anything. It was all talked among the twelve jurors there and then the foreman, he says, we had better drop that and talk about something else, and so we then dropped the insurance business and talked about something else as far as I remember. That was when we first started. When I first went into the jury box I didn't mean to give him nothing, because I thought he was in the wrong as much as anybody else, and I didn't want to give him nothing, but after that insurance business come up, they was all wanting to give him $45,000.00; well, I felt kind of funny there, wanting to give nothing, and some of them wanting to give $45,000.00, and so I hushed my mouth for a long time.

"* * * I just stated to the Court then that I would have been there yet if I thought Mr. Hampton would have had to pay for it; I made up my mind to stay there six months if he had to pay for it. By Hampton I mean the defendant in this case, The Hampton Company, or Mr. Hampton.

"* * * I told Judge O'Brien while ago that the thing that made me give my verdict was because the majority were in favor of giving a verdict; that is partly true. The other part was, the majority wanted to pay him so much and I was one of the low men and rather than to hang the thing up and be there maybe till now, I went along with them and agreed to give it to him. The reason why I went along with them and agreed to change my mind was because there was so many, looked like, against us few, and they wanted to pay him, because they said Hampton wouldn't have to pay it because his company was insured, and all such as that, you know; God knows what was said; you know I can't remember it all. The foreman possibly told us not to consider insurance; that did not stop them from discussing it all the time. They discussed it three or four times after that to my knowledge.

"* * * The Court: I don't understand the juror. Mr. Lacy, you understood that you were to find a verdict on the evidence, didn't you?

"Witness: Well, that's what I intended to do and that's what I tried to do.

"The Court: And you admit that there was no evidence about an insurance company and yet, without any evidence, you found this verdict on evidence that didn't exist?

"Witness: Well, the insurance was—I thought I went by the evidence in the case; I did try to.

"Q. How could you think you did when you say you didn't know there was any insurance, but yet you let it influence your verdict?

"Witness: Well, they were all that way; most of them was that way.

"The Court: Well, they all ought to be fined to the limit of the law; every one of you that went out there and found a verdict —after you had sworn you were going to find a verdict according to the evidence, you went out and reached a verdict on something else which was not in evidence.

"Witness: Well, there was so much said and done until I don't remember now all that was said and done.

"* * * If I told Mr. Baker that insurance wasn't discussed in the room I don't remember it. I don't remember telling him. I don't think I did; I don't know why I had to tell him."

The juror Wallace testified:

"I don't remember its being stated by anyone that the defendant in this case was covered with insurance, but they gave reason why they should be, and that they were, but none of them got up and said that they knew that it was a cinch that they were. The discussion of insurance in the jury room influenced me to a certain extent in returning my verdict in this case—that is, as to the amount we arrived at, or whether or not we found the defendant guilty of negligence, but not altogether.

" * * * Mr. Farha was the foreman of the jury. They did discuss insurance; with him telling them not to. Mr. Farha did not tell them that he was in the insurance business and that, inasmuch as it was an ambulance involved here, that he know that ambulances were not covered by insurance; that was a side argument came up about that. He made that remark that if an ambulance was covered by insurance it was highly rated.

" * * * There wasn't a word in evidence about any insurance. To a certain extent I went out and let something influence me that wasn't in evidence; to the extent of about $2,500.00.

" * * * The foreman had warned us long before that that we couldn't consider insurance, but still it would have some bearing on a man's mind."

Questioned by the Court: "Someone in the jury room testified to me that this company was insured. Several of them made the remark in the jury room that they were insured; that they couldn't say for sure that they were. They didn't say they had seen the policy or had written the policy, but they were sure that they were insured. That *about the insurance company was mentioned when we were fixing the verdict.*"

The juror Barnes testified: "Mr. Farha was the foreman of the jury. Mr. Farha warned the jury that it made no difference whether Mr. Hampton had insurance or not; that was not to enter into the case. Insurance was mentioned while the jury was deliberating, but it was not so much discussion of it, just because of what Mr. Farha said, and what one or two others said, that it was *not supposed to be considered at all.*"

Eight jurors testified. The other four were summoned, but did not appear.

We have given most careful consideration to the entire record on motion for new trial. We have found no circumstance in the record that would impeach the integrity of Jurors Lacy and Wallace. True, there are certain expressions in their testimony which, taken alone, might indicate that, in reaching their verdict, they considered only the testimony given by the witnesses, but that is not a fair construction of their testimony as a whole. Whether on examination by counsel for appellant, or cross-examination by counsel for appellee, or examination by the court, the quotations made from their testimony correctly reflect the facts testified to by them. There was also testimony by one of the lawyers for appellee that he met Mr. Lacy in a barbershop shortly after the trial and Mr. Lacy told him that insurance was not discussed. Mr. Lacy remembered the conversation but did not give it that construction.

There was no dispute that "insurance" was discussed, and we are compelled to accept the statements of Mr. Lacy and Mr. Wallace that the discussion of insurance entered into their verdict adversely to the interests of appellant. That it did affect the verdict was clearly recognized by the trial court in the following statement made by him to the juror Lacy: "The Court: Well, they all ought to be fined to the limit of the law; every one of you that went out there and found a verdict —after you had sworn you were going to find a verdict according to the evidence, you went out and reached a verdict on something else which was not in evidence."

█ The facts of this case invoke the principles of Moore v. Ivey (Tex. Com. App.) 277 S. W. 106, 107, where the court said: "The determinative rules, or principles, of law are plain and well established. If, upon a consideration of the whole of the pertinent record, it is reasonably doubtful whether or not the improper conduct affected the amount of the verdict or the decision of any other material issue, the verdict should be set aside by the trial judge; if, in such a case, a new trial is not granted, there is an abuse of discretion by the trial judge; and reversal becomes the duty of appellate courts." In that case, the Supreme Court expressly approved "the holding of the Commission of Appeals on the questions discussed in its opinion." Southern Traction Co. v. Wilson (Tex. Com. App.) 254 S. W. 1104, 1106, was cited in Moore v. Ivey, supra, in support of the proposition just quoted. In that case, the Commission of Appeals, by an opinion expressly approved by the Supreme Court, reversed the judgment of the lower court on the conclusion that the juror Moore was influenced by an improper discussion of attorney's fees. That attorney's fees was discussed in that case was shown with-

out dispute, just as "insurance" was discussed in this case. In passing on the issue of misconduct, the court said:

"So we must look largely to Moore alone, in this particular case, to ascertain whether or not he was influenced by the improper discussion. What does Moore say? It is true that, in certain portions of his testimony before the court, he says he considered the legitimate evidence and the charge of the court in reaching his verdict. But, he never does say that he did not consider the discussion about attorneys' fees also in reaching his verdict. That is very significant. On the other hand, portions of his said testimony show rather clearly that he himself thought the improper discussion in the jury room may have influenced him to a certain extent. Of course, if it influenced him at all, even though the extent be indefinite, his verdict must be set aside. In this connection we quote as follows from his testimony, as given on the hearing itself before the trial judge:

" 'I cannot say what effect that discussion (about attorneys' fees) had on me. Of course, it was in my mind at the time, but I cannot say that it affected me to a great extent. It is a hard question for me to answer as to whether it affected me or not at all.'

"Furthermore, upon the hearing, he was confronted, by way of impeachment, with the affidavit he made a few days after he returned his verdict. In that affidavit he stated positively he was influenced by the improper discussion of attorneys' fees."

In that case, the facts and circumstances relied upon to impeach the juror Moore were much stronger than the facts and circumstances in this case. In that case, in certain portions of his testimony, the juror Moore said that he considered the legitimate evidence and the charge of the court in reaching his verdict; possibly the testimony of the jurors Lacy and Wallace in this case were subject to that construction. In that case, Moore never did say "that he did not considered the discussion about attorney's fees also in reaching his verdict"; in this case, Lacy and Wallace, at all times when the matter was brought to their attention, said that the subject of insurance did affect their verdict.

In that case, Moore testified that it was hard for him "to answer as to whether it affected me or not at all"; in this case, there was not the least hesitancy on the part of these two jurors in admitting, at all times, that they were affected in rendering their verdict by the reference to insurance. In reversing that case on the testimony alone of the juror Moore, notwithstanding the elements of impeachment against him and notwithstanding the uncertain and equivocal character of his testimony, the court said: "A reading of the entire record leads almost to the conclusion that the juror was improperly influenced. At any rate, he himself was uncertain about it. So are we. It is reasonably doubtful, to say the least of it, whether he was influenced or not by these extraneous matters in arriving at the amount of the verdict he was willing to award. The case should be reversed."

■ Complaint is made that the court refused to submit certain defensive issues raised by the pleadings of appellant and the proof offered in support of the pleadings. Without discussing these assignments in detail, it is sufficient to say that appellant was entitled to a submission of every defensive issue that had support in both its pleadings and proof.

■ Appellant makes the point that the finding of the jury to the effect that at the time of the accident the automobile was being driven at a negligent rate of speed was without support in the pleadings. That assignment can be obviated on another trial.

■ On authority of Fort Worth & Denver Railway Co. v. Rogers (Tex. Civ. App.) 62 S. W.(2d) 151, appellant was entitled to a definition of the term "proper lookout." The reasoning of that case would also require a definition of the term "proper control." We are not ruling that a definition of these terms was required, but are merely calling appellee's attention to the fact that the point has been heretofore ruled against him.

We have carefully considered all other assignments, and they are overruled as without merit.

For the reasons stated, the judgment of the lower court is reversed, and the cause remanded for a new trial.