James Eugene **FLANIGAN** et al.,
Appellants,

v.

Jack **CARSWELL** et al., Appellees.

No. 10570.

Court of Civil Appeals of Texas.

Austin.

June 11, 1958.

Rehearing Denied July 2, 1958.

Vinson, Elkins, Weems & Searls, Thomas B. Weatherly, Gaius G. Gannon, Jr., Houston, for appellants.

Max Garrett, Houston, for appellees.

GRAY, Justice.

Appellee, Jack Carswell, suffered injuries to his person and to his property when his ambulance (operated by him) collided with an automobile operated by appellant, James Eugene Flanigan.

Carswell sued Flanigan and appellant, J. C. Smith operating as Courteous Cab Service, and alleged that Flanigan was Smith's agent. He further alleged that on the afternoon of May 23, 1955, he was making an emergency call in his ambulance; that he was driving with his siren and red light equipment engaged and working; that as he approached the intersection of Richmond Avenue and Mandell Street in the City of Houston Flanigan was also approaching said intersection, and that the collision occurred as the result of acts of negligence of Flanigan which negligence proximately caused the collision and the resulting injuries.

Subsequently Flanigan filed a separate suit against Carswell for damages for personal injuries sustained by him in the collision and alleged such damages were sustained as a proximate result of Carswell's negligence.

The above causes were consolidated and subsequent to such consolidation Bobby Wilson, a minor, by his next friend W. L. Wilson intervened. He alleged that at the time of the collision he was a passenger in the ambulance; that he suffered personal injuries as a proximate result of Flanigan's negligence and sought a recovery against Flanigan and Smith for his damages.

Smith sued Carswell for damages sustained to his automobile which was operated by Flanigan.

A judgment, on a jury's verdict, was rendered awarding Carswell and Bobby Wilson damages against Flanigan and Smith jointly and severally. Smith and Flanigan were denied any recovery against Carswell.

Carswell and Bobby Wilson, upon the trial court's order, filed remittiturs. Thereafter judgment in favor of Carswell for $12 000 and in favor of Bobby Wilson for $2,000 was entered.

█ Flanigan and Smith have appealed and by their first point say that the trial court erred in overruling their plea to the jurisdiction of that court because prior to the trial the cause was dismissed ·for want of prosecution; that the cause had never been reinstated, and that the judgment of dismissal had become final.

This cause proceeded to trial September 9, 1957. On that day appellants filed their plea to the jurisdiction of the trial court which alleged substantially that some months prior thereto the cause was regularly called for trial; that the plaintiffs made no announcements; that the cause was dismissed for want of prosecution, and that it had never been reinstated. The plea was sworn to by an attorney who' was present at the call of the docket when the cause was dismissed.

The transcript contains no judgment dismissing the cause and no judgment overruling the plea. However appellants rely on notations ·made on ·two docket sheets which are:

1.     "Jury Docket June 10, 1957
"*     *     *     *     *     *
"456242
    *Dismissed*

"Jack Carswell et al     James Eugene
                                        Flanigan
                                        et al 55"

and

2. "Sep. 9, 1957 Plea to jurisdiction overruled."

Appellants do not contend that there is any record other than as is above stated to show that any judgment was entered of record.

In Hamilton v. Empire Gas & Fuel Co., 134 Tex. 377, 110 S.W.2d 561, 566, the court said:

"Judgments and orders of courts of record to be effectual must be entered of record. Neither entries in the judge's docket nor affidavits can be accepted as substitute for such record; and docket entries, affidavits, and other like evidence can neither change nor enlarge judgments or orders as entered in the minutes of the court. R.S.1925, arts. 1899, 1902, 1918; Rule 65 for District Courts; Ex parte Rains, 113 Tex. 428, 433, 257 S.W. 217; Daniel v. Daniel (Tex.Civ.App.) 128 S.W. 469 (application for writ of error refused); Noblett v. Olive (Tex. Civ.App.) 259 S.W. 305; De Zavala v. Scanlan (Tex.Com.App.) 65 S.W. 2d 489, 491."

The judgment alleged in support of point one was not entered of record and it is not effective. The point presents nothing for review. Ex parte Rains and Daniel v. Daniel, both supra. 25 Tex.Jur., p. 427, Sec. 60. Point one is overruled.

The majority holds that reversible error is not presented by the showing that Carswell did not have a chauffeur's license.

They also hold that the trial court erred in requiring appellees to file remittiturs and sustain their cross point praying that the judgment be reformed by restoring thereto the amounts of the remittiturs. I do not agree.

Carswell operated a funeral home in the City of Houston. He owned the ambulance in question for which he had been issued a permit by the Texas State Health Department under Art. 4590b, Vernon's Ann.Civ.St. The permit designated it as an emergency ambulance.

Carswell was driving the ambulance and was traveling at a rate of speed in excess of thirty miles per hour but not over forty. Carswell did not have a chauffeur's license but had only an operator's license. At the place where the collision occurred the speed limit for ordinary traffic was thirty miles per hour and for emergency vehicles it was forty miles per hour. As to his earnings from the ambulance Carswell testified:

"Q. Are you telling the jury you made $60.00 a day over a period of a year from the use of that ambulance? A. Yes sir, average income.

"Q. If you made $60.00 a day that would be $1800.00 a month? A. Average."

By issue three the trial court asked the jury if "the vehicle operated by plaintiff, Jack Carswell, was on an authorized emergency run at the time of the collision in question?" The jury found that it was.

By issue six the jury was asked if Flanigan "failed to yield the right of way to the vehicle being driven by" Carswell. The jury found he did. By issue nine the jury was asked:

"Do you find from a preponderance of the evidence that Jack Carswell was driving the ambulance in question at a rate of speed in excess of forty miles per hour?"

The jury found he was not.

Appellants objected to the charge for the reasons that Carswell had not complied with the law in regard to driving an ambulance at a rate of speed in excess of thirty miles per hour and that he did not have a chauffeur's license as required by law to authorize him to drive the ambulance in excess of thirty miles per hour. They also requested the submission of an issue inquiring if Carswell was operating his ambulance at a speed in excess of thirty miles per hour and requested accompanying issues of proximate cause. These issues were refused. Appellants also filed their motions for an instructed verdict, for judgment non obstante veredicto and for mistrial.

It must be determined whether Carswell was lawfully authorized to drive his ambulance at a rate of speed in excess of thirty miles per hour when he did not have a chauffeur's license? Or, stated differently, do the facts that the ambulance was an emergency ambulance and was on an emergency run authorize it to be driven at a rate of speed of forty miles per hour regardless of the license held by its operator?

There is no dispute that the vehicle driven by Carswell was an emergency ambulance and that it was driven at a rate of speed in excess of thirty miles per hour.

Here Carswell sues for his own personal injuries and defends the suit against him on the ground that the law authorized him to drive forty miles per hour and further required Flanigan to yield the right of way to him.

An ambulance is a motor vehicle. Sec. 1(b) of Art. 6687b, Vernon's Ann.Civ.St. Sec. 1(o) of that article defines a chauffeur as:

"every person who is the driver for wages, compensation, or hire, or for

fare, of a motor vehicle transporting passengers."

Sec. 2(a) provides:

"(a) No person, except those hereinafter expressly exempted, shall drive any motor vehicle upon a highway in this State unless such person has a valid license as an operator, a commercial operator, or a chauffeur under the provisions of this Act."

Sec. 3 names persons who are exempt from license requirements, and in part provides that:

"It shall not be necessary for an employee of any incorporated city, town or village of this State or county of this State when holding an operator's permit to obtain a chauffeur's license in order to operate an official motor vehicle in the service of such incorporated city, town, village or county."

Ambulance drivers are not exempted by said section. Carswell was not an employee of the city and the ambulance was not operated in the service of the city.

Art. 813, Vernon's Ann.P.C. defines a chauffeur and makes it a misdemeanor for any person to operate a motor vehicle as a chauffeur when such person is not licensed to do so. Also Sec. 44 of Art. 6687b supra makes it a misdemeanor for any person to violate any of the provisions of the Act.

Carswell's testimony supra shows he was operating his ambulance for compensation. Also we think it must be said that he was transporting passengers. Hazen v. Chambers, 71 App.D.C. 220, 108 F.2d 741. The question there presented was whether ambulances in which persons were carried for a fee were subject to a statute providing:

"Owners of passenger vehicles for hire, whether operated from a private establishment or from public space, other than those licensed in the two preceding paragraphs, shall pay a license tax of $25 per annum for each such vehicle used in the conduct of their business." D.C.Code Supp. IV, T. 20, § 1731(d).

The court said:

"Sick or well, one who is carried, for hire, through the streets in a vehicle kept and driven by another for such purposes seems to us to be a passenger in the ordinary sense of the word. Whether the hire is greater or less than the cost of the service is not material. Unless a restricted meaning is to be given to the word 'passenger' in this statute, it follows that these ambulances are 'passenger vehicles for hire.' We see no reason for giving the word a restricted meaning. In fact, there is excellent reason for not doing so, since § 1731(e) of the Code defines by reference to the quoted section those vehicles whose drivers are required to have 'character' licenses and display numbered badges. These requirements seem at least as appropriate to ambulance drivers, who carry helpless passengers, as to cab drivers."

Art. 4590b, supra is specific in naming the requirements for securing a permit for an ambulance but makes no provision as to the kind of license the operator shall have. The absence of this provision cannot be of any assistance to Carswell on the question here presented because if such absence is to be construed as having any meaning it could just as well mean that the operator of the ambulance was not required to have any kind of operator's license. This would be contrary to the express provisions of Art. 6687b supra providing that "no person, except those hereinafter expressly exempted, shall drive any motor vehicle upon a highway * * * unless such person has a valid license * * * under the provisions of this Act." The provisions of the Act. Sec. 1(o) supra, provide that the driver of a motor

vehicle for "wages, compensation, or hire, or for fare" is a chauffeur.

Art. 791, Vernon's Ann.P.C. and Sec. 8 of Art. 827a, exempt "ambulances responding to emergency calls" and other named vehicles from the operation of the general speed law. Those statutes contemplate the lawful operation of the vehicles. Here we are concerned not with the ambulance as such but with the driver's authority under the law to drive it at a rate of speed in excess of the rate fixed for general traffic.

There is before us an ordinance of the City of Houston which defines an ambulance, requires a permit for its operation and also requires a permit to be secured from the Director of Public Works for the driver of such ambulance. An examination of the ordinance is not necessary further than to say that it cannot legally conflict with the Constitution and general laws of this State. Constitution, Art. 11, Sec. 5, Vernon's Ann.St., Art. 1165, Vernon's Ann.Civ.St. Arts. 6687b and 813, supra are general laws of the State and, in any event, are controlling over the provisions of the ordinance if in conflict therewith. 30–A Tex.Jur., Secs. 305 and 306, p. 295 and p. 299.

The cause was submitted to the jury on the theory that Carswell was operating an authorized emergency ambulance, and, if at the time of the collision he was on an authorized emergency run, he was authorized to drive at a speed of forty miles per hour, and was entitled to the right of way over other vehicles. This theory was no doubt argued to the jury. Issues three, six and nine supra justified such argument. Thus Flanigan was put on an unequal driving basis with Carswell who was afforded an unjust advantage even though he was violating Arts. 813 and 6687b, supra.

In reaching my conclusion I of course separate the ambulance and its driver Carswell. To here say that Carswell was

entitled to the privileges afforded an emergency vehicle and to urge the same in support of his cause of action and in defense of that alleged against him would ignore the provisions of Arts. 6687b and 813, supra. It would be equivalent to saying that the driver of an emergency ambulance is entitled to the privileges secured to emergency vehicles regardless of licensing requirements prescribed by the Legislature. Carswell

"was not a trespasser on the street; he had a right to drive his automobile there just the same as any other person had; the law forbade him to operate a motor vehicle on the street 'as a chauffeur.' By 'a chauffeur' is meant one who operates an automobile for hire. The law permitted him to drive that car upon the street when he got a license for the car. He was not permitted to carry passengers in it until he got his license as a chauffeur. If he violated the law, he was guilty of a misdemeanor and punishable by fine. His act which authorizes such fine is not operating his automobile on the street, but carrying passengers for hire." Stack v. General Baking Co., 283 Mo. 396, 223 S.W. 89, 95.

See also annotations in 105 A.L.R. p. 69 et seq.

The holding in Stack v. General Baking Co. supra is applicable to the facts here even though it may be said that Wilson was not a passenger but was an employee of Carswell and therefore Carswell at the time was not carrying a passenger. The fact remains that he was driving his ambulance at a rate of speed in excess of thirty miles per hour which he was not authorized to do.

What has been said supra, in my opinion, requires that the judgment in favor of Carswell be reversed. There then remains the disposition of the judgment in favor of Bobby Wilson.

Bobby Wilson alleged that he was a passenger in the ambulance but testified that he was an ambulance attendant for the Carswell Funeral Home and that he operated the siren switches on the ambulance.

It is the general rule that ordinarily a passenger or guest in a motor vehicle driven by another may lawfully rely on the driver to keep a proper lookout and to exercise proper care. However when the passenger or guest suffers injuries as the result of a collision of the vehicle in which he is riding with another vehicle the driver or owner of such other vehicle may escape liability for damages upon showing that the conduct of the other driver was the sole proximate cause of the collision. Tex.Jur. 10 Yr.Sup., Vol. 2, p. 273, Sec. 320.

In their answer to Wilson's plea of intervention appellants alleged that Carswell's negligence was the sole cause of the collision. No issue was submitted and none were requested submitting this defense to the jury.

The jury found that just prior to the collision Wilson "acquiesced and consented to the manner in which the ambulance was being driven by" Carswell. And further found that in doing so Wilson did not fail "to exercise that degree of care of an ordinarily prudent person under the same or similar circumstances."

Under this state of the record there arises the question: Does Rule 434, Texas Rules of Civil Procedure, permit a reversal as to Carswell and an affirmance as to Wilson? Rule 434, in part, provides:

"When the judgment or decree of the court below shall be reversed, the court shall proceed to render such judgment or decree as the court below should have rendered, except when it is necessary that some matter of fact be ascertained or the damage to be assessed or the matter to be decreed is uncertain, in either of which cases

the cause shall be remanded for a new trial. * * * if it appear to the court that the error affects a part only of the matter in controversy, and the issues are severable, the judgment shall only be reversed and a new trial ordered as to that part affected by such error."

The cause was tried on the erroneous theory that Carswell was authorized to drive at forty miles per hour and it must be ascertained whether he was negligent in so driving and whether such negligence, if any, was a proximate cause of the collision.

Any recovery of damages by Wilson as well as Carswell depends on a showing of negligence on the part of Flanigan. As is above stated this issue of negligence was not properly tried because the theory of the trial as well as the submission was that Carswell could lawfully drive at forty miles per hour while Flanigan was limited to thirty miles per hour.

The alleged negligence of Flanigan is the foundation of Wilson's cause of action as well as that of Carswell and the issue is not severable. See Waples-Platter Co. v. Commercial Standard Insurance Co., Tex., 294 S.W.2d 375. Schumacher Co. v. Shooter, 132 Tex. 560, 124 S.W.2d 857—decided under former Rule 62a.

The jury found that $30,000 would fairly and reasonably compensate appellee, Carswell, for personal injuries sustained by him and that $5,000 would so compensate appellee, Bobby Wilson. In their motion for new trial appellants complained that the verdict as to each of appellees was excessive to such extent as to require either a new trial or remittiturs. Upon hearing this motion the trial court found that the motion "ought to be granted unless within ten days after the rendition of this Order, the plaintiffs voluntarily file" remittiturs as follows: $18,000 as to Carswell and $3,000 as to Bobby Wilson. Thereafter the remittiturs were filed

without protest and the motion for new trial was overruled.

Appellees say that Rule 328, Texas Rules of Civil Procedure, affords them the right to have the above action reviewed. The source of Rule 328 is Art. 2235 which had been considered by the courts prior to the adoption of the rule. In World Oil Co. v. Hicks, 129 Tex. 297, 103 S.W.2d 962, the court answered a certified question concerning the right of a trial court to require a remittitur. The court said the question was too general to be answered yes or no, but in support of its conclusion that a trial court may, with the consent of the plaintiff, enter judgment after remittitur the court quoted from Texas & N. O. Ry. Co. v. Syfan, 91 Tex. 562, 44 S.W. 1064, 1065, as follows:

"The weight of authority sustains a doctrine contrary to that heretofore asserted by our courts, and accords to the court trying the case the discretion to suggest a remittitur of a stated amount as a condition upon which a motion for new trial will be overruled or a judgment affirmed, when there is no other error, and the court finds that the verdict of the jury is for an excessive amount, and that, upon the plaintiff's accepting the terms and entering the remittitur, the court may overrule the motion for rehearing or affirm the judgment, the error being cured by the remittitur."

After the adoption of Rule 328, supra remittiturs have also been considered. In Texas & New Orleans R. Co. v. Goolsbee, Tex.Civ.App., 238 S.W.2d 280, the jury assessed appellee's damages for personal injuries at $22,500. The trial court ordered a remittitur of $8,000 which was filed "under protest." The Court of Civil Appeals held that the railroad was not liable to appellee for damages for his injuries and reversed the judgment of the trial court without discussing other assignments of error or the remittitur. The cause reached the Supreme Court, the judg-

ment of the Court of Civil Appeals was reversed and the cause was remanded to that court for further consideration. 149 Tex. 445, 234 S.W.2d 407. The Court of Civil Appeals again reversed the judgment of the trial court because of the absence of jury findings relating to the doctrine of imminent peril. In disposing of the question as to the remittitur the court said: "Appellee chose to make the remittitur." It then cited World Oil Co. v. Hicks supra and said:

"* * * the trial court has the discretion to suggest remittitur of a stated amount as a condition on which a motion for a new trial will be overruled or a judgment affirmed where there is no other error and the court finds that the verdict of the jury is for an excessive amount." Texas & N. O. R. Co. v. Goolsbee, Tex.Civ. App., 238 S.W.2d 250, 254.

Again the above cause reached the Supreme Court, 150 Tex. 528, 243 S.W.2d 386. That Court disagreed with the Court of Civil Appeals as to its announcements of the law under the doctrine of imminent peril, reversed the judgment of the Court of Civil Appeals and affirmed that of the trial court. Neither the trial court nor the Court of Civil Appeals assigned any reason for requiring the remittitur, and neither did the Supreme Court in affirming the judgment of the trial court.

In Adams v. Houston Lighting & Power Co., Tex., 314 S.W.2d 826, the Supreme Court said:

"* * * The case being one of an excessive verdict, there is no rule prescribing the manner by which the court determines the amount of remittitur. The amount of damages arrived at by the court in that manner, $25,500, was approximately one-half of the damages pleaded and one-half of the damages having support in the evidence. We cannot, therefore, hold as a matter of law that the court erred in the amount of remittitur required."

In arriving at the amount of damages sustained by the respective appellees the jury was instructed to consider the following elements and none other: past and future physical pain and mental anguish and the present cash value of loss of earning capacity.

A review of the evidence shows that after the collision Carswell went to a hospital; that he called his attorney; that he remained in the hospital overnight and then went home; that in a short time he returned to work at his funeral home and that in about six weeks he resumed driving an ambulance. His injuries consisted principally of swelling in his left arm and head with bleeding from a cut tongue and ear. At the time of the trial he was suffering from some pain in his neck, left shoulder and left arm, the cause of which was attributed to nerve pressure.

Bobby Wilson's principal injury was to his back for which he was treated. At the time of the trial it bothered him when he tried to lift anything. Neither of the parties were rendered unconscious and neither sustained any fractured bones.

It appears to be well settled that a trial court may require a remittitur of excessive damages as a condition to overruling a motion for new trial, and that when, as here, such remittitur is filed and such excessive damages are released error is not presented. I cannot say that the amount of the judgment of the trial court did not afford appellees just compensation for their injuries nor that the trial court abused his discretion in requiring the remittiturs as a condition to overruling appellants' motion for new trial.

I would reverse the judgment of the trial court and remand the cause because of what I believe was an erroneous submission.

1. We do not analyze this statute except to say that as to the driver of an ambulance it provides only that it is a penal offense to operate it without first having obtained the required permit.

HUGHES, Justice.

█ We concur in the statement of the case made by Associate Justice GRAY in his opinion prepared for the Court and also in the disposition made by him of appellants' plea to the jurisdiction (Appellants' Point One) and to such extent his opinion is adopted.

Points Two—Six, inclusive, are briefed jointly and we will discuss them together.

█ These points, in various manners, raise the questions of whether or not the ambulance in which appellees were riding when the collision occurred was entitled to the status of an emergency vehicle it appearing that all of the legal requirements pertaining to such status were complied with except that, if it be considered a requirement, appellee Carswell, the operator of the ambulance, did not have a chauffeur's license required of a commercial driver by Art. 6687b, Secs. 1(o) and 2(a), V.A.C.S., and also that he had not complied with certain ordinances of the City of Houston.

We are of the opinion that the failure of Carswell to have a chauffeur's license is immaterial to this issue for two reasons· (1) the qualifications of the driver of an emergency vehicle form no part of the legal definitions of an emergency vehicle (2) appellee Carswell had an ordinary operator's license and the requirements for a chauffeur's license are identical except for the fee charged.

The ambulance being operated by appellee Carswell was properly covered by a permit issued by the Texas State Health Department under authority of Art. 4590b, V.A.C.S. [1]

Art. 791, V.A.P.C., provides that laws relating to the speed of motor vehicles do not apply to "ambulances responding to

emergency calls" but it provides that incorporated cities and towns may regulate the speed of ambulances by ordinance.

It is to be noted that this statute does not purport to define an ambulance nor does it condition its application upon any qualification of the operator.

The same may be said of Sec. 24(b) of Art. 6701d, V.A.C.S., which provides that the driver of an emergency vehicle when responding to an emergency call shall not be required to stop at stop signals.

Appellants cite two cases to support their position: Walsh v. Dallas Railway and Terminal Company, 140 Tex. 385, 167 S. W.2d 1018 and Smith v. Dallas Railway and Terminal Company, Tex.Civ.App. Waco, 250 S.W.2d 256, writ ref., N.R.E.

In Walsh the Court held that the ambulance involved was not an emergency vehicle under an ordinance of the City of Dallas because (1) "the ambulance in question does not come within the description of any of the vehicles definitely described in the ordinance" and (2) the section of the ordinance invoked was invalid. [140 Tex. 385, 167 S.W.2d 1021.]

In Smith (1952) it was held that an ambulance was not a "police vehicle" within the meaning of Sec. 2(d), Art. 6701d, V. A.C.S.[2]

The cases do not, in our opinion, support the contention that the operator of an ambulance must have a chauffeur's license in order for the ambulance to be classed as an emergency vehicle. Rather, we believe, they support our position that it is the vehicle, not the operator, and the laws pertaining thereto which alone fixes its status as an emergency vehicle.

Sec. 6 of Art. 6687b, V.A.C.S., provides the same form of application for an operator's license and a chauffeur's license and Sec. 10 of the same Article provides for identical examinations for both operator's and chauffeur's license applicants and Sec. 11 provides that upon payment of the required fee a license shall be issued to an operator or chauffeur as the case may be. Sec. 19 fixes the fee for a chauffeur's license to be $4 and an operator's license $2.

The only distinction which the statutes draw between the issuance of a chauffeur's license and an operator's license is the difference in fees. This shows, conclusively, that the requirement that a chauffeur's license be obtained in certain instances is made for revenue purposes only, a matter not relevant to statutes pertaining to emergency vehicles.[3] It is apparent that the only motive which the Legislature had in this regard was to aid those who render and those who receive emergency service.

Appellants do not contend here that the failure of appellee Carswell to have a chauffeur's license was a proximate cause of the collision or that the doctrine of negligent entrustment, exemplified in Mundy v. Pirie-Slaughter Motor Co., 146 Tex. 314, 206 S.W.2d 587, is applicable here.

We believe that these exclusions leave appellants devoid of any basis for contending that the Carswell ambulance was not entitled to emergency status simply because he was delinquent $2 to the State in the matter of fees. The ambulance and its

---

2. This Article was amended in 1953 so as to include private ambulances "for which permits have been issued by the State Board of Health." Acts 1953, 53rd Leg. p. 749, ch. 297, Sec. 1.

3. In Worsham Buick Co. v. Isaacs, 121 Tex. 587, 51 S.W.2d 277, 280, 86 A.L.R. 232 the Court said:

"The various provisions of our statutes, which relate to the use of license plates on automobiles, disclose no legislative purpose to prevent collisions on the public highways. The safety of travelers on the highways is plainly not the object at which those provisions aim. They do not purport to extend protection to persons using the public highways. In disobeying those provisions, the motor company did not violate any duty which it owed to Isaacs or to any other traveler on the public highways."

operator and owner had complied with every statute pertaining to attaining this status and we cannot read into these statutes provisions or conditions not there the effect of which would be to deprive intended beneficiaries of the privileges which the statutes purport to give.

■ An ordinance of the City of Houston provides that, except in certain areas, ambulances responding to emergency calls may lawfully travel not to exceed forty miles an hour.

Appellants contend that this ordinance is invalid because other ordinances, presumably passed at the same time, are concededly invalid.

Appellants, with commendable candor cite Sam v. Sullivan, Tex.Civ.App. Galveston, 189 S.W.2d 69, writ ref. w. o. m., which holds against them as to these selfsame ordinances. Appellants do not approve the reasoning in that case and differentiate it here on the ground that this record does not show that the City code has a "saving clause" upon which the Court relied in Sam's case.

We would reach the same result without the "saving clause" and hence follow the decision in that case.

■ Under these points appellants also take the position that Art. 791, V.A.P.C., exempting ambulances responding to emergency calls has been repealed by implication by the later enactment of Art. 827a, Sec. 8, V.A.P.C., which is a statute generally regulating the speed of motor vehicles on our highways.

With the same candor, noted above, appellants cite the adverse holding in Hampton Company v. Joyce, Tex.Civ.App. Beaumont 1935, 80 S.W.2d 1066, writ dismissed.

We agree with the decision in that case and hence do not discuss it except to note that Art. 827a, Sec. 8 was amended in 1941 and again in 1951, subsequent to the decision in Joyce, without expressly repealing Art. 791, supra.

These conclusions dispose of appellants' appeal.

ARCHER, Chief Justice, has prepared the following portion of this opinion in which HUGHES, Justice, concurs.

■ We come to consider appellees' First Cross Point that:

"The Trial Court erred in ordering remittitur as follows: 'Plaintiff Carswell to remit $18,000.00 and plaintiff Bobby Wilson $3,000.00 failing herein defendants' Motion for New Trial granted as per order.'"

Upon receipt of the jury's verdict awarding Carswell $30,000 and Wilson $5,000 the court entered judgment for the respective sums and overruled defendants' motion N.O.V. and the decree was entered on October 2, 1957.

On October 21, 1957 leave was granted defendants to file a motion for new trial.

On October 28, 1957 Carswell was directed to remit $18,000 and Wilson $3,000; failing to do so, defendants' motion for a new trial was granted.

On October 31, 1957, remittiturs were filed and motion for new trial was overruled.

We are unable to ascertain the reasons the trial court had to direct the remittiturs and must then review the evidence before the jury on the trial of this case, and in so doing we are controlled by Rule 328, T.R.C.P., and the law in connection therewith.

In 13 Tex.Jur., Sec. 155, p. 28, the general principle regarding a jury's determination of damages is:

"Determination of the sum which will compensate a Plaintiff for physical injuries involves a consideration of elements for which no mathematical standard of measurement exists, nor indeed any recognized standard except

what an honest and impartial jury, uninfluenced by passion, prejudice or other improper motive, may deem adequate. The law merely declares that such damages shall be limited to just compensation, and that in a very large measure the amount must be left to the sound discretion and impartial judgment of the jury. A verdict is usually accepted as binding and conclusive upon the court, and especially upon the appellate court, even where in the opinion of the appellate court more was awarded than ought to have been allowed, unless it is manifest to that court that the jury were inflamed or influenced by passion, prejudice, sympathy, or some other improper motive in arriving at the verdict."

Rule 328 provides:

"New trials may be granted when the damages are manifestly too small or too large, provided that whenever the court shall direct a remittitur in any action, and the same is made, and the party for whose benefit it is made shall appeal in said action, then the party remitting shall not be barred from contending in the appellate court that said remittitur should not have been required either in whole or in part, and if the appellate court sustains such contention it shall render such judgment as the trial court should have rendered without respect to said remittitur."

Tarrant County Water Control and Improvement Dist. No. 1 v. Fowler, Tex.Civ. App., 175 S.W.2d 694, affirmed by Supreme Court in 142 Tex. 375, 179 S.W.2d 250; Davis Transport, Inc., v. Bolstad, Tex.Civ. App. Galveston 1956, 295 S.W.2d 941, no writ history; Red River Valley Pub. Co. v. Bridges, Tex.Civ.App., 254 S.W.2d 854, er. ref., N.R.E.

As we have stated, the court assigned no reason for requiring the remittiturs and we do not find anything in the record of the testimony justifying the action.

Carswell testified that he was 34 years old, was in the funeral and ambulance service, and detailed the accident as follows:

"Q. And where you were—in your quarter or were you in your vehicle when it came to a rest? A. Yes I was.

"Q. Where were you in your vehicle? A. I was down in the bottom, my head hit the curb and my arms went into the door there, I went partly out of the cab of the ambulance and was on the ground.

"Q. As *you* arm hit the ground, what happened to your head? A. Well, it immediately swole up, about this size and my head this size.

"Q. At that time did you have any other condition existing, like bleeding? A. I bled a lot after I had cut my tongue and there was some bleeding in the ear.

"*     *     *     *     *     *

"Q. (By Mr. Garrett) All right Mr. Carswell, did you ultimately go to seek any medical treatment that day? A. Yes I did.

"Q. When did you go do that? A. I imagine ten or fifteen minutes after the accident occurred.

"Q. Where did you go? A. To Doctor *McGee's* Office.

"Q. How did you go to Doctor *McGee's* Office? A. A fellow took me over in an ambulance.

"Q. All right sir. When you got to Doctor *McGee's* Office what did you do? A. I explained about the ambulance and the collision and about how my arms were hurting the most, hurting me very much and he went to checking me over and decided I should

go to the hospital and have them make X-Rays of the arms and check the side of my head and neck and he told my wife—

"Mr. Weatherly; Objection to that your Honor.

"The Court: Do not say what someone else said.

"A. He told me to have her take me to the hospital.

"Q. Did you go to the hospital? A. Yes sir.

"Q. What hospital did you go to? A. Methodist.

"Q. How long did you stay there? A. Just overnight.

" *     *     *     *     *     *.

"Q. (By Mr. Garrett) Where does the pain originate sir. A. It originates right back here in my neck and radiates down my left arm.

"Q. Do you have any loss of feeling in your body anywhere? A. Other than—

"Q. Do you have any loss of feeling in your body anywhere? A. Well, this left arm since the accident has occurred has become somewhat weaker than my right arm in comparison and fatigues more than my right and some work is tedious and it takes strength that I have to do and I have to sit down and rest.

"Q. In connection with your work is it necessary to do any lifting? A. Yes sir it is.

"Q. Is it necessary to use your arms and full strength at times? A. Yes sir."

An extensive cross examination was had, and based on a deposition given by Carswell prior to the trial and as to the testimony on trial as to the accident and the failure to have a chauffeur's license, pha-

ses of which have been discussed in other parts of this opinion.

Dr. McGehee, a duly licensed medical doctor, who appears to have had exceptionally good training and considerable experience testified that:

"Q. Doctor, do you know Jack Carswell? A. I know him very well.

"Q. Is he a patient of yours? A. A patient of mine, yes sir.

"Q. And when did you first see Jack Carswell in regards to say right around the 23rd day of May, 1955? A. Well, I had known him before that because he is in the business, ambulance service business and being a doctor, he brings patients to all doctors at hospitals, but I didn't see him professionally until May the 23rd, 1955.

"Q. And on that date, sir, would you tell the jury what history Mr. Carswell gave you upon your seeing him on that date? A. He states on that date he was driving his ambulance on an emergency call to a private residence at 1908 Richmond Avenue—

" *     *     *     *     *
"Q. Did you, after taking his history, examine him? A. Yes sir.

"Q. You gave him a physical examination? A. Yes sir.

"Q. And what did that examination reveal? A. Well, I—our examination was somewhat limited that day because we didn't know to what extent he was injured and we didn't want to move him around too much and I checked the range of motion in the cervical spine and the—elbow and he had a big goose egg on his head and he had limitation of motion in the cervical spine, limited to about 25% of normal—75% of normal, and had tenderness throughout the cervical spine and I felt we should make X-Rays.

"Q. Did you make those at your office? A. At our clinic.

"Q. Are they made by a technician in your clinic? A. Yes sir.

"Q. Under your supervision? A. Yes sir.

"Q. Were they made under your supervision? A. Yes sir, of the left elbow and the neck. They were normal pictures, they didn't show any fractures.

"Q. Incidentally, doctor, what do X-Rays reveal? A. Only the bony structure of the body.

"Q. Do they show the muscles, ligaments or tendons? A. The mere outline of muscles, nothing in detail except calcium deposits.

"Q. Just what do you do with X-Rays in the specialty of orthopedic surgery? A. They are used to find out if the person does have a fracture or any other pathology of the bones, whether it is arthritis or a tumor or a cyst.

"  *    *    *    *    *    *

"Q. Have you examined him on numerous occasions since the date of the accident? A. Yes sir.

"Q. And would you tell us generally what you found? A. Well, he continued to have trouble primarily with his neck and the shoulder region and the left side of his face and we would give him physical therapy at the office consisting of heat, massage and traction to his neck and when he still didn't get any better we had him see—

"  *    *    *    *    *    *

"Q. Now, did you continue to treat Jack? A. Yes sir.

"Q. What type of treatment did you give him? A. Mainly physical therapy, heat and massage to relax muscle spasm and overcome pain.

"Q. What did you find in his muscles in his cervical spine? A. What did you say?

"Q. With respects to the muscles in his cervical spine, what did you find? A. We still found a restriction of motion due to tightness in the muscles.

"Q. In the cervical spine? A. Yes, the cervical spine.

"  *    *    *    *    *    *

"Q. Where is the trouble Jack is having? A. Mainly in the sixth and seventh.

"Q. Between the sixth and seventh? A. Mainly those two vertebrae. It can involve the joint of—above and below.

"  *    *    *    *    *    *

"Q. (By Mr. Garrett) Doctor, tell the jury what you have found to be the trouble with Jack Carswell's neck? A. In addition to the restriction of motion, the tightening he has is consistent from the evidence of nerve root pressure, it wasn't a real serious type of thing as you think of a ruptured disk but it isn't difficult enough to realize it is nerve root pressure because of the pain radiating to the neck and to the shoulders and to the arm, not all the way down, and the bicept reflexes you get by using a rubber hammer on the elbow, that reflex is *abent* and still is.

"Q. Is there any other symptoms in the left arm that were demonstrated by Jack? A. He has pain on movement and has pain in his neck that is radiating from the neck to the shoulder to the arm.

"  *    *    *    *    *    *

"Q. What is your opinion of Jack Carswell and his medical history considering the time that has elapsed as to the permanence of this injury? A. I believe it's been over two years since the accident and the last time

I examined him he still had different evidence of this weakness and weakness in his left hand which was manifested by weakness in his grip and after two years I think it is a permanent thing.

"Q. Would you say, Doctor, it is a disabling pain? A. Yes sir.

"Q. How disabiling is this nerve root pressure and the condition you found in Jack's arm here? A. It works two ways as far as disabling is concerned.

"* * * * * *

"Q. (By Mr. Garrett) Can an operation be performed sir? A. Yes sir.

"Q. And is it a certain thing if it is performed that a person will be relieved of the pain? A. No."

The testimony concerning the injuries of Wilson in part is:

Mr. Wilson testified that he was 19 years old at the time of the accident, and was an ambulance attendant for Carswell and

"Q. Tell the jury to the best of your ability what injuries you received in that accident? A. Well, in the accident I had cuts and bruises and I had a knot on my head and a cut on the nose and my back was injured.

"Q. Anywhere else? A. No sir.

"Q. All right now, since the date of the accident or at the time, I beg your pardon, at the time of the accident, did you receive any kind of treatment at the scene? A. At the scene of the accident?

"Q. Yes. A. Well, the Harris County Emergency Corps was there. I don't remember what they told me but to sit down and wait on an ambulance.

"Q. Did you wait on an ambulance? A. Yes sir.

"Q. Did it come? A. Yes sir.

"Q. Where did they take you? A. To the Houston Osteopathic Hospital.

"Q. When you went to the hospital there, did you have a doctor see you? A. Yes sir.

"Q. And who was that? A. W. V. Durden.

"Q. Did he treat you—strike that please. Did you ask him to treat you for your injuries? A. Yes sir.

"Q. Did he commence treatment and if so what was the treatment and for how long? A. Well, that particular afternoon he did something for this knot on my head and put something on the cut and put ice packs on my head and said he would wait to the next morning to see about my back.

"Q. All right, did you tell him when he came to see you in the hospital what had happened? A. Yes sir.

"Q. How long did you stay in the hospital? A. Four days.

"Q. And upon your release from the hospital, have you, since that time been to see Doctor Durden? A. Yes sir.

"Q. Would you tell the jury, if you know, how many times you have been to see Doctor Durden? A. I don't know, numerous times.

"Q. Numerous times? A. Yes sir.

"Q. Right after the accident how often did you go see Doctor Durden? A. I believe once a week for a while after I got out of the hospital.

"Q. When you would go to see him there at the hospital what did he do for you? A. Gave me treatment.

"Q. What kind? A. With his hands on my back he would pull on my legs and bend them around and he

had some type of electrical device and some type of heating pad.

"Q. Did he ever put you on a machine—have you laid on a machine that rolls you or anything like that? A. A machine that's got something in it that rolls up over my back, yes sir.

"Q. How long has he been treating you with those sort of treatments? A. Ever since I was released from the hospital.

"Q. Has he been treating you up to the present time? A. Yes sir.

"Q. Bobby, what kind of trouble do you have with your back, do you know? A. Yes sir, it bothers me when I am working. I mean it bothers me constantly when I start to lift sometimes, I can't lift it hurts me so bad."

Dr. W. V. Durden, a duly licensed physician, testified that he treated Bobby Wilson at the Houston Osteopathic Hospital and

"Q. Now you have testified you gave him a physical examination, and I'll get back to that question, what did you find when you gave him a physical examination on that day? A. I found that he had a traumatic—a raised place on his head, a bump on his head, if you want to call it that and a laceration on it and he complained of his neck, especially on the right side.

"Q. He complained of what sir? A. His neck, especially on the right side.

"*     *     *     *     *     *

"Q. (By Mr. Garrett) Now, you were relating what you found and you said a bump or knot on his head with a laceration on it and his neck, he complained of his neck, especially on the right side. Would you go ahead sir? A. And in the—some pain in the middle dorsal region which is the region about mid-way of your ribs, pain in the low back and pain in his knees.

"*     *     *     *     *     *

"Q. About how long did he stay, do you recall? A. Three or four days.

"Q. Now, after the treatment in the hospital did you then have him call at your office for treatment? A. I did.

"Q. I'll ask you if he has called at your office from that time to this time? A. Yes sir.

"Q. Have you seen him recently? A. I have.

"Q. Have you examined him on each occasion when he came to your office? A. Yes sir.

"Q. Have you given him any treatment or treatments each time he came to your office? A. Yes sir.

"Q. Now, would you tell the jury and the Court what kind of treatment that you gave him during that period of time? A. I gave him manipulating treatments and I gave him physical therapy in the form of diathermy and traction and in the beginning when this was painful he had analgesics.

"Q. Is that for his pain? A. Medication.

"Q. All right, Doctor, this manipulative treatment, would you give us in lay terms what type of treatment that is sir, and what you do? A. Well, it is treatment to try to correct a part to its original place in some cases. Also you might say to increase the circulation to the part.

"Q. If you will just speak up. A. I'll try.

"Q. Now, Doctor, tell us what the results of your treatment was over that period of time, say from the hospital time—let's start with that, and how he progressed in the hospital? A. Well, his recovery was uneventful and as far as the individual treatment of his condition and especially the head injury, the danger of the head injury, I might

put it that way, or what I thought might be the danger of a head injury.

"Q. I see from that treatment in the hospital and your examinations, do you determine a diagnosis as to what you felt Bobby had suffered in this accident? A. You mean as far as in general?

"Q. Yes sir, did you make a diagnosis of what you felt was wrong with him at that time, say what you felt was his condition * * * A. I thought he had suffered a *cebrial* concussion.

"* * . * * * * .

"Q. (By Mr. Garrett) Doctor, the symptoms you have talked about here in the low back, are they indicative of any permanent type of injury? A. Yes.

"Q. And what is that type of injury sir, or condition, I mean, what type of permanent condition would those symptoms indicate to you? A. Low back strain in the area I have mentioned.

"Q. A low back strain—I have heard you say something about a sprain, is there a difference between a sprain and a strain? A. The strain is a result of a sprain.

"Q. Is the strain a permanent condition? A. In my opinion, yes.

"Q. Well, sir, what is your opinion, based on your examinations of Bobby Wilson—as to what his present condition is in the low back? A. Well, I think he has—I think that joint is permanently disabled.

"* * * * * *

"Q. I see. Now, Doctor, is it a condition you think will get better or get worse? A. I don't know that it will get better, it is very speculative to say whether it will get worse or not.

"Q. Do you have an opinion as to whether you think it will remain the same? A. I think he will always have the injury I have tried to describe."

In the absence of evidence to show that the jury verdict was improperly motivated and in the absence of any reason assigned by the trial court for requiring remittiturs and the verdict being within the bounds of reason we sustain appellees' First Cross Point and, in accordance with Rule 328, render judgment on the jury verdict. To do otherwise would be to make jurors of judges.

It is our judgment that the judgment of the trial court be reformed by awarding appellee Carswell $30,000 and appellee Wilson $5,000 in lieu of the amounts specified in the judgment and as reformed the judgment of the trial court is affirmed.

Reformed and as reformed affirmed.